FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ APR 29 2019 ★

BROOKLYN OFFICE

WK/ABS:AE
F. #2017R01057

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

IOURI WINOGRADOV,

          Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

S U P E R S E D I N G
I N D I C T M E N T

Cr. No. 18-317 (S-1) (JBW)
(T. 18, U.S.C., §§ 371, 982(a)(1),
982(a)(7), 982(b)(1), 1956(h) and 3551
et seq.; T. 21, U.S.C., § 853(p); T. 26,
U.S.C., § 7206(1))

THE GRAND JURY CHARGES:

## INTRODUCTION

At all times relevant to this Superseding Indictment, unless otherwise indicated:

I.    Background

    A.    The Medicare and Medicaid Programs

        1.    The Medicare program ("Medicare") was a federal health care program providing benefits to persons who were at least 65 years old or disabled. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services. Individuals who received benefits under Medicare were referred to as Medicare "beneficiaries."

        2.    The New York State Medicaid program ("Medicaid") was a federal and state health care program providing benefits to individuals and families who met specified financial and other eligibility requirements, and certain other individuals who lacked

adequate resources to pay for medical care. CMS was responsible for overseeing the Medicaid program in participating states, including New York. Individuals who received benefits under Medicaid were similarly referred to as "beneficiaries."

3.  Medicare and Medicaid were each a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

4.  Medicare was divided into multiple parts. Medicare Part B covered the costs of physicians' services and outpatient care, such as physical therapy, occupational therapy and diagnostic tests. Generally, Medicare Part B covered these costs only if, among other requirements, they were medically necessary, ordered by a physician, actually rendered and not induced by the payment of remuneration.

5.  Medicaid covered the costs of medical services and products ranging from routine preventive medical care for children to institutional care for the elderly and disabled. Among the specific medical services and products provided by Medicaid were transportation, physical therapy, occupational therapy and diagnostic tests. Generally, Medicaid covered these costs only if, among other requirements, they were medically necessary and ordered by a physician.

6.  In order to bill Medicare and Medicaid for the cost of treating Medicare and Medicaid beneficiaries and providing related benefits, items and services, medical providers and suppliers were required to apply for and receive a provider identification number ("PIN") or provider transaction access number ("PTAN") from each program. The PIN/PTAN allowed medical providers and suppliers to submit bills, known as claims, to Medicare and Medicaid to obtain reimbursement for the cost of treatment and related health care benefits, items and services that they had supplied and provided to beneficiaries.

7.   A medical provider was required to be enrolled in Medicare and Medicaid in order to submit claims. To enroll in the Medicare program, a medical provider was required to enter into an agreement with CMS in which the provider agreed to comply with all applicable statutory, regulatory and program requirements for reimbursement from Medicare. By signing the Medicare enrollment application, the provider certified that the provider understood that payment of a claim was conditioned on the claim and the underlying transaction complying with Medicare regulations, Medicare program instructions and the law, and on the provider's compliance with all applicable conditions of participation in Medicare. A similar agreement was required of providers enrolled in the Medicaid program.

8.   Medical providers and suppliers were authorized to submit claims to Medicare and Medicaid only for services they actually rendered and items they actually provided, and were required to maintain patient records verifying the provision of services and items.

9.   To receive reimbursement from Medicare and Medicaid for covered services and items, medical providers were required to submit claims, either electronically or in writing, using specific claim forms. Each claim form required certain important information, including: (a) the beneficiary's name and identification number; (b) the PIN/PTAN of the doctor or other qualified health care provider who ordered the health care benefit, item or service that was the subject of the claim; (c) the health care benefit, item or service that was provided or supplied to the beneficiary; (d) the billing codes for the benefit, item or service; and (e) the date upon which the benefit, item or service was provided or supplied to the beneficiary. By submitting the claim, the provider was certifying, among

3

other things, that the items and services were not induced by kickbacks, were rendered to the beneficiary and were medically necessary.

10. Ambulette companies provided transportation services for Medicaid beneficiaries in non-emergency situations. Ambulette transportation services were covered by Medicaid. As with other medical providers, ambulette companies were required to apply for enrollment, be enrolled and revalidate that enrollment in order to submit claims for reimbursement to Medicaid. In both the enrollment and revalidation process, medical providers, including ambulette companies, were required to disclose any person or entity with an ownership or control interest in that provider.

B.    Relevant Entities and Persons

11. Ambulette Star Trans, Inc. ("Star") was a New York corporation located at 1901 Emmons Avenue, Suite 212, Brooklyn, New York, and other locations. Individual-1, whose identity is known to the Grand Jury, was listed in the Medicaid enrollment and revalidation paperwork as the owner and president of Star. Star purported to provide transportation to Medicare and Medicaid beneficiaries to and from, among other locations, medical clinics within the Eastern District of New York.

12. The defendant IOURI WINOGRADOV, together with others, controlled a number of shell companies (the "Winogradov Shell Companies"), including WI Prompt Services Group ("WI Prompt") and LZ Trans Services, Inc. ("LZ Trans"). WI Prompt purported to do business at 1461 Shore Parkway, Suite 5E, Brooklyn, New York, and

other locations. LZ Trans also purported to do business at 1461 Shore Parkway, Suite 5E, Brooklyn, New York, and other locations.

13. The defendant IOURI WINOGRADOV was listed with the New York State Department of State, Division of Corporations, as the Chief Executive Officer of WI Prompt. WINOGRADOV opened and controlled bank accounts in the name of WI Prompt.

14. Individual-2, whose identity is known to the Grand Jury, opened and controlled bank accounts in the name of LZ Trans. Individual-2 signed checks on behalf of LZ Trans, which the defendant IOURI WINOGRADOV and his co-conspirators used to further the criminal scheme described below.

15. Certain of the defendant IOURI WINOGRADOV's co-conspirators owned and operated additional shell companies (the "Co-conspirator Shell Companies").

16. Co-conspirator-1 ("CC-1"), an individual whose identity is known to the Grand Jury, owned and operated a number of the Co-conspirator Shell Companies and used bank accounts opened in the names of those companies to assist the defendant IOURI WINOGRADOV and his co-conspirators in furthering the criminal scheme described below. The Co-conspirator Shell Companies controlled by CC-1 included, among others, the following entities, the names of which are known to the Grand Jury:

(a) Shell Company-1, which purported to do business at 2276 East 13th Street, Brooklyn, New York, and other locations;

(b) Shell Company-2, which purported to do business at 1218 Neptune Avenue, Brooklyn, New York, and other locations;

(c) Shell Company-3, which purported to do business at 46 Hollywood Avenue, Lynbrook, New York, and other locations; and

5

(d) Shell Company-4, which purported to do business at 2911 Surf Avenue, Brooklyn, New York, and other locations.

17. Co-conspirator-2 ("CC-2"), an individual whose identity is known to the Grand Jury, owned and operated a number of the Co-conspirator Shell Companies and used bank accounts opened in the names of those companies to assist the defendant IOURI WINOGRADOV and his co-conspirators in furthering the criminal scheme described below. The Co-conspirator Shell Companies controlled by CC-2 included, among others, the following entities, the names of which are known to the Grand Jury:

(a) Shell Company-5, which purported to do business at 2955 Brighton 4th Street, Brooklyn, New York, and other locations; and

(b) Shell Company-6, which purported to do business at 2327 83rd Street, Brooklyn, New York, and other locations.

18. Provider-1, an individual whose identity is known to the Grand Jury, was a licensed occupational therapist authorized to participate in the Medicare and Medicaid programs. Provider-1 incorporated Professional Corporation-1 ("PC-1"), an entity the name of which is known to the Grand Jury, in approximately July 2013.

19. PC-1 was a New York State corporation that operated at 129 West End Avenue, Brooklyn, New York, and other locations. PC-1 purported to provide occupational therapy services to Medicare and Medicaid beneficiaries.

20. Provider-2, an individual whose identity is known to the Grand Jury, was a licensed physical therapist authorized to participate in the Medicare and Medicaid programs. Provider-2 incorporated Professional Corporation-2 ("PC-2"), an entity the name of which is known to the Grand Jury, in approximately April 2007.

21.     PC-2 was a New York State corporation that operated at 129 West End Avenue, Brooklyn, New York, and other locations. PC-2 purported to provide physical therapy services to Medicare and Medicaid beneficiaries.

## II.   The Kickback and Money Laundering Scheme

22.     Between approximately September 2010 and April 2014, the defendant IOURI WINOGRADOV, together with others, agreed to execute and executed a scheme whereby they: (a) referred beneficiaries to medical clinics in return for illegal kickback payments; (b) artificially and corruptly increased demand for medical services by making and causing to be made cash payments to Medicare and Medicaid beneficiaries to induce those beneficiaries to subject themselves to medically unnecessary services, including physical and occupational therapy; (c) paid illegal kickbacks to ambulette drivers, including drivers at Star, and others in return for providing beneficiaries to multiple medical clinics; and (d) engaged in deceptive acts and contrivances intended to mislead, hide information, avoid suspicion and avert further inquiry into the scheme.

23.     Specifically, and in part, the defendant IOURI WINOGRADOV, together with others, submitted and caused to be submitted to Medicare and Medicaid claims for services, including occupational therapy, physical therapy and ambulette transportation, that they knew were induced by cash payments to beneficiaries.

24.     To receive payment for these claims, Provider-1, Provider-2 and other medical providers submitted and caused the submission of paperwork that permitted them to receive electronic deposits from Medicare and Medicaid into bank accounts under their control.

25. The Co-conspirator Shell Companies were purportedly in the business of providing management, consulting, advertising, marketing, medical support and other commercial services. In reality, these companies provided only superficial staffing and business support services, and were primarily used to conceal the nature of the kickback payments to the defendant IOURI WINOGRADOV and his co-conspirators and also to generate cash to pay the kickbacks to beneficiaries and others.

26. Provider-1, Provider-2 and other medical providers submitted and caused the submission of claims for services purportedly provided to beneficiaries referred to PC-1 and PC-2 as a result of cash payments. These claims were subsequently paid, in whole and in part, by Medicare and Medicaid. Upon receiving these payments from Medicare and Medicaid, Provider-1, Provider-2 and other medical providers transferred substantial sums of this money using checks made payable to various Co-conspirator Shell Companies. These transfers were made for, among other purposes, the referral of beneficiaries to PC-1, PC-2 and other medical clinics.

27. The defendant IOURI WINOGRADOV, together with others, used checks to transfer funds among and between Star, the Winogradov Shell Companies and the Co-conspirator Shell Companies' bank accounts. These transfers were designed, in whole and part, to further disguise the nature, location, source, ownership and control of the proceeds generated by the scheme.

28. The defendant IOURI WINOGRADOV, together with others, converted many of the checks written to the Co-conspirator Shell Companies into cash through a series of transactions that included, among other steps, cashing checks at check-

cashing businesses. These cash transactions were designed, in whole and part, to disguise the nature, location, source, ownership and control of the proceeds generated by the scheme.

29. Between approximately September 2010 and April 2014, Star was paid approximately $7.6 million as a result of claims it submitted to Medicaid.

III. The Tax Fraud Scheme

30. The Internal Revenue Service ("IRS"), an agency within the U.S. Department of the Treasury, was responsible for administering and enforcing federal revenue laws and regulations regarding the ascertainment, computation, assessment and collection of taxes owed to the United States by its citizens and residents.

31. To accurately assess and collect taxes, the IRS, among other things, determined taxpayers' actual income, credits and deductions. In doing so, the IRS used, among other means, tax returns filed pursuant to the tax laws and regulations of the United States. In general, citizens or residents of the United States who earned income during a calendar year in excess of a threshold amount, and domestic corporations in existence for any part of a tax year, filed income tax returns for that year to report taxable income.

32. For each of the Winogradov Companies, the defendant IOURI WINOGRADOV and Individual-2 were required to file with the IRS an Income Tax Return for an S Corporation, Form 1120S ("Form 1120S"), to report such company's gross receipts, income, gains, losses, deductions, credits and income tax liabilities. Because the Winogradov Companies were S Corporations, WINOGRADOV and Individual-2 were required to report to the IRS, among other things, their share of each S Corporation's income on their United States Individual Income Tax Returns, Form 1040 ("Form 1040").

33. Between approximately July 2012 and July 2014, the defendant IOURI WINOGRADOV and others conspired to file and caused to be filed false tax returns with the IRS for WINOGRADOV and the Winogradov Companies.

34. Specifically, for tax years 2012 and 2013, the defendant IOURI WINOGRADOV falsely reported to the IRS that the payments he made to the Co-conspirator Shell Companies were real and legitimate business expenditures when, as WINOGRADOV then and there well knew and believed, a substantial portion of this money was paid for illegal patient referrals. By representing the payments to the Co-conspirator Shell Companies as legitimate business expenses, WINOGRADOV caused: (a) the Forms 1120S filed with the IRS to falsely under-report income and claim deductions; and (b) the Forms 1040 filed to falsely under-report income.

## COUNT ONE
(Conspiracy to Receive and Pay Health Care Kickbacks)

35. The allegations contained in paragraphs one through 29 are realleged and incorporated as if fully set forth in this paragraph.

36. In or about and between September 2010 and April 2014, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant IOURI WINOGRADOV, together with others, did knowingly and willfully conspire to: (a) solicit and receive kickbacks, directly and indirectly, overtly and covertly, in cash and in kind, in return for referring Medicare and Medicaid beneficiaries to Provider-1, Provider-2 and other medical providers for the furnishing of and arranging for the furnishing of items and services for which payment may be made in whole and in part under Medicare and Medicaid, contrary to Title 42, United States Code, Section 1320a-7b(b)(1)(A); and

(b) offer and pay kickbacks, directly and indirectly, overtly and covertly, in cash and in kind, to one or more persons to induce such persons to refer Medicare and Medicaid beneficiaries to Provider-1, Provider-2 and other medical providers for the furnishing of and arranging for the furnishing of items and services for which payment may be made in whole and in part under Medicare and Medicaid, contrary to Title 42, United States Code, Section 1320a-7b(b)(2)(A).

37. In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendant IOURI WINOGRADOV, together with others, committed and caused to be committed, among others, the following:

### OVERT ACTS

(a) On or about August 7, 2013, WINOGRADOV opened a bank account, ending in number 2270, at Investors Bank in the name of WI Prompt; and

(b) On or about October 9, 2013, WINOGRADOV wrote check number 1012 in the approximate amount of $4,880, payable to Shell Company-4, drawn on the Investors Bank account ending in number 2270 and held in the name of WI Prompt.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

### COUNT TWO
(Money Laundering Conspiracy)

38. The allegations contained in paragraphs one through 29 are realleged and incorporated as if fully set forth in this paragraph.

39. In or about and between June 2013 and April 2014, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant IOURI WINOGRADOV, together with others, did knowingly and intentionally

11

conspire to conduct one or more financial transactions in and affecting interstate commerce, to wit: deposits, withdrawals and transfers of funds and monetary instruments, which transactions in fact involved the proceeds of one or more specified unlawful activities, to wit: receiving health care kickbacks, paying health care kickbacks, and conspiracy to receive and pay health care kickbacks, in violation of Title 42, United States Code, Section 1320a-7b(b)(1)(A), Title 42, United States Code, Section 1320a-7b(b)(2)(A), and Title 18, United States Code, Section 371, respectively, knowing that the property involved in such financial transactions represented the proceeds of some form of unlawful activity, and knowing that such financial transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of one or more of the specified unlawful activities, contrary to Title 18, United States Code, Section 1956(a)(1)(B)(i).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

### COUNT THREE
(Conspiracy to Defraud by Obstructing the Lawful Functions
of the Internal Revenue Service)

40. The allegations contained in paragraphs one through 34 are realleged and incorporated as if fully set forth in this paragraph.

41. In or about and between July 2012 and July 2014, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant IOURI WINOGRADOV, together with others, did knowingly and willfully conspire to defraud the United States by impairing, impeding, obstructing and defeating the lawful government functions of the IRS, an agency and department of the United States, in the ascertainment, computation, assessment and collection of revenue, to wit: income taxes.

42. In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendant IOURI WINOGRADOV, together with others, committed and caused to be committed, among others, the following:

### OVERT ACTS

(a) On or about July 18, 2013, WINOGRADOV filed and caused to be filed a Form 1120S on behalf of WI Prompt for the tax year 2012; and

(b) On or about July 8, 2014, WINOGRADOV filed and caused to be filed a Form 1120S on behalf of WI Prompt for the tax year 2013.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

### COUNTS FOUR THROUGH SEVEN
(Subscribing to a False and Fraudulent Tax Return)

43. The allegations contained in paragraphs one through 34 are realleged and incorporated as if fully set forth in this paragraph.

44. On or about the dates set forth below, within the Eastern District of New York and elsewhere, the defendant IOURI WINOGRADOV did knowingly and willfully make and subscribe the United States Corporation and Individual Tax Returns set forth below, each of which was verified by a written declaration that it was made under the penalties of perjury and was filed with the Internal Revenue Service, and which WINOGRADOV did not believe to be true and correct as to every material matter, as the tax returns falsely reported taxable income in the following amounts, when, as WINOGRADOV

13

then and there well knew and believed, his taxable income exceeded the amounts stated in the returns:

| Count | Approximate Date | Form | False Statement |
|---|---|---|---|
| FOUR | April 30, 2013 | U.S. Individual Income Tax Return, Form 1040 for tax year 2012 | Reported Taxable Income, on line 43, of $114,896 |
| FIVE | July 18, 2013 | U.S. Income Tax Return for an S Corporation, Form 1120S on behalf of WI Prompt for tax year 2012 | Reported Ordinary Business Income, on line 21, of $19,193 |
| SIX | June 19, 2014 | U.S. Individual Income Tax Return, Form 1040 for tax year 2013 | Reported Taxable Income, on line 43, of $71,695 |
| SEVEN | July 8, 2014 | U.S. Income Tax Return for an S Corporation, Form 1120S on behalf of WI Prompt for tax year 2013 | Reported Ordinary Business Income, on line 21, of $17,497 |

(Title 26, United States Code, Section 7206(1); Title 18, United States Code, Sections 3551 et seq.)

### CRIMINAL FORFEITURE ALLEGATION AS TO COUNT ONE

45. The United States hereby gives notice to the defendant that, upon his conviction of the offense charged in Count One, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(7), which requires any person convicted of a federal health care offense to forfeit any property, real or personal, that constitutes, or is derived directly or indirectly from, gross proceeds traceable to the commission of such offense.

46. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

    (a)    cannot be located upon the exercise of due diligence;

    (b)    has been transferred or sold to, or deposited with, a third party;

    (c)    has been placed beyond the jurisdiction of the court;

    (d)    has been substantially diminished in value; or

    (e)    has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Sections 982(a)(7) and 982(b)(1); Title 21, United States Code, Section 853(p))

## CRIMINAL FORFEITURE ALLEGATION AS TO COUNT TWO

47. The United States hereby gives notice to the defendant that, upon his conviction of the offense charged in Count Two, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(1), which requires any person convicted of such offense to forfeit any property, real or personal, involved in such offense, or any property traceable to such property.

48. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

 (a) cannot be located upon the exercise of due diligence;

 (b) has been transferred or sold to, or deposited with, a third party;

 (c) has been placed beyond the jurisdiction of the court;

 (d) has been substantially diminished in value; or

 (e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Sections 982(a)(1) and 982(b)(1); Title 21, United States Code, Section 853(p))

A TRUE BILL

_____
FOREPERSON

_____
RICHARD P. DONOGHUE
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

_____
ROBERT ZINK
ACTING CHIEF, FRAUD SECTION
CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE

16

F. # 2017R1057
FORM DBD-34
JUN. 85

No. _____

**UNITED STATES DISTRICT COURT**

EASTERN *District of* NEW YORK

CRIMINAL DIVISION

THE UNITED STATES OF AMERICA

vs.

Iouri Winogradov,

Defendant.

**SUPERSEDING INDICTMENT**
(T. 18, U.S.C., §§ 371, 982(a)(1), 982(a)(7), 982(b)(1), 1956(h) and 3551 et seq.; T. 21, U.S.C. § 853(p); T. 26, U.S.C. § 7206(1).)

*A true bill.*

_____
*Foreperson*

*Filed in open court this* _____ *day,*

*of* _____ *A.D. 20* _____

_____
*Clerk*

*Bail, $* _____

*Andrew Estes, Trial Attorney (718) 254-6250*

17